## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MIGUEL ANGEL ZUNIGA-RODRIGUEZ, et al.<br><br>Defendants. | MEMORANDUM DECISION AND ORDER DENYING MOTION TO SUPPRESS<br><br>Case No. 2:18-cr-110<br><br>Judge Clark Waddoups |

Before the court is a Motion to Suppress (ECF No. 94) filed by Defendant Miguel Angel Zuniga-Rodriguez ("Mr. Zuniga-Rodriguez"). The motion has been joined by Defendant Alfonso Ramos-Soto ("Mr. Ramos-Soto"). (ECF Nos. 98, 111). Although Mr. Zuniga-Rodriguez and Mr. Ramos-Soto present their arguments as part of a unified motion, because they attack different applications for wiretaps, the court will analyze their arguments separately. The Motion has been fully briefed, and the court heard argument on the same at a hearing held on March 29, 2021. For the reasons stated herein, the Motion to Suppress is **DENIED**.

## BACKGROUND

Mr. Zuniga-Rodriguez and Mr. Ramos-Soto are both charged under an Indictment filed on February 21, 2018. (ECF No. 34). They face charges of Conspiracy to Distribute Methamphetamine, Conspiracy to Distribute Heroin, Conspiracy to Distribute Cocaine. (*See id*.). Mr. Zuniga-Rodriguez also faces separate charges of Possession of Heroin with Intent to Distribute, Possession of Cocaine with Intent to Distribute, Possession of Methamphetamine with Intent to Distribute, and three charges of Distribution of Methamphetamine. (*Id*.). Mr.

1

Ramos-Soto faces a separate charge of Possession of Methamphetamine with Intent to Distribute. (*Id.*). These charges are, in least in part, supported by evidence that was obtained by the government through the use of wiretaps.

Mr. Ramos-Soto targets the TT-2 Wiretap, which was initially authorized by Judge Nuffer on November 8, 2017 and supported by an application (the "TT-2 Application") that included, among other things, an Affidavit signed by Mike Sannar, an agent with Davis Metro Narcotics Strike Force (the "TT-2 Affidavit" and together with the TT-2 Application, the "TT-2 Documents") (ECF No. 133-2).[1] Mr. Zuniga-Rodriguez targets the TT-4 Wiretap, which was authorized by Judge Shelby on January 11, 2018 and was supported by an application (the "TT-4 Application") that included, among other things, an Affidavit signed by Mike Sannar, (the "TT-4 Affidavit" and together with the TT-4 Application, the "TT-4 Documents") (ECF No. 133-4).

Mr. Zuniga-Rodriguez and Mr. Ramos-Soto both argue that the applications for the TT-2 and TT-4 Wiretaps failed to establish that the wiretaps were necessary, and that as such, all evidenced seized under those wiretaps should be suppressed.

## <u>DISCUSSION</u>

Once a wiretap is authorized, it is presumed to have been proper and supported by probable cause, and a defendant faces a high burden in overturning that presumption. *See United States v. McDowell*, 520 F. App'x 755, 759 (10th Cir. 2013). To the contrary, the government's burden in establishing that a wiretap is necessary "'is not great.'" *United States v. Verdin-Garcia*, 516 F.3d 884, 890 (10th Cir. 2008) (citations omitted).

---

[1] The TT-2 Wiretap was subsequently renewed by Judge Shelby on January 11, 2018. The government's request for the renewal of the TT-2 Wiretap was combined with its request for the TT-4 Wiretap. As such, the TT-4 Documents also applied to the TT-2 renewal.

The Tenth Circuit has recognized that "[i]n order to prove that a wiretap is necessary, the government must show that traditional investigative techniques have been tried unsuccessfully, reasonably appear to be unsuccessful if tried, or are too dangerous to attempt." *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002) (citing 18 U.S.C. §§ 2518(1)(c), 2518(3)(c)). "Such measures include: '(1) standard surveillance; (2) questioning and interrogating witnesses or suspects, including through the use of grand jury proceedings; (3) search warrants; (4) infiltration of criminal groups by confidential informants and undercover agents; (5) pen registers; and (6) trap and trace devices.'" *United States v. Barajas*, 710 F.3d 1102, 1107 (10th Cir. 2013) (quoting *United States v. Foy,* 641 F.3d 455, 464 (10th Cir.2011)).

If the government did not try "any of these traditional investigative techniques . . . [it] must explain why with particularity." *Ramirez-Encarnacion*, 291 F.3d at 1222 (citations omitted). While agents are not required to "'exhaust all other conceivable investigative procedures before resorting to wiretapping,'" they are required to "explain the need for wiretaps with some degree of specificity," and their "'statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap.'" *Foy*, 641 F.3d at 464 (citations omitted).

A court reviewing these statements should "consider 'all the facts and circumstances in order to determine whether the government's showing of necessity is sufficient to justify a wiretap' and read the necessity requirement 'in a common sense fashion.'" *Id*. (citations omitted). The necessity requirement "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 (1974) (citations omitted). The requirement

"is not to be treated hypertechnically," and the government's "overall burden" in meeting this requirement "'is not great.'" *Verdin-Garcia*, 516 F.3d at 890 (citations omitted).

When, as here, the government in engaged in an ongoing investigation that involves multiple wiretaps, the Tenth Circuit has recognized the following principles guide the court. First, while the government may not "'move swiftly from wiretap to wiretap,'" it is not obligated "to repeat these forms of investigation between each wiretap." *United States v. Garcia*, 232 F.3d 1309, 1315 (10th Cir. 2000) (citations omitted). Rather, when an investigation is ongoing, the Tenth Circuit has upheld wiretaps "when they display . . . 'new discussion of information learned, surveillance conducted, and so on, subsequent to the previous wiretap application.'" *Barajas*, 710 F.3d at 1107–08 (citation omitted). Second, it is permissible for the government to incorporate by reference previous applications into a new application for a wiretap. *See United States v. Castillo-Garcia*, 117 F.3d 1179, 1195–96 (10th Cir. 1997), *overruled on other grounds by United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002). Finally, when the government's investigation into a conspiracy leads it to request multiple wiretaps, there is no requirement that the information it provides in support of a subsequent wiretap must be specifically tailored to the individual who is ultimately discovered to be the owner of the tapped telephone. Rather, the Tenth Circuit has "held on numerous occasions that the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps." *Foy*, 641 F.3d at 464–65 (citations omitted).

**I. The TT-2 Documents contained a sufficient showing that the TT-2 Wiretap was necessary.**

Mr. Ramos-Soto argues that because the government failed to establish, through the TT-2 Documents that the TT-2 Wiretap was necessary, the court should suppress all evidence obtained

against him through the use of the TT-2 Wiretap.  He primarily attacks the investigative

techniques used, and allegedly omitted, by the government.  Each will be discussed in turn.

### 1.  Standard Surveillance

The TT-2 Affidavit incorporates by reference officers' use of physical surveillance, and

the limitations of the same, set forth in the TT-1 Documents and adds information as to what

physical surveillance officers have used since the time those documents were submitted.  (*See*

ECF No. 133-2 at 35–37).  Among other things, the TT-2 Affidavit states that officers have

"conducted physical surveillance on a daily basis since interception commenced," which

included "conduct[ing] physical surveillance without the aid of interceptions on a vehicle and an

apartment complex used by [Mr. Ramos-Soto]."  (*Id*. at 35–36).  The Affidavit then provided

summaries of three sessions of surveillance that were conducted on three days in October 2017

as an example of the type of surveillance they were engaged in.

The Affidavit then represented that while the use of physical surveillance "has moved

[officers] closer to meeting [their] objectives, [it] alone is not likely to allow us to achieve [their]

objectives," as it "generally provides little information about the significance of travel,

conversations, or meetings."  (*Id*. at 37).  The Affidavit further noted that "drug traffickers

operating on [Mr. Ramos-Soto's] level are generally very surveillance conscious" and that

"[a]gents believe that [he] may have detected surveillance on October 23, 2017, when he got out

of his vehicle and stared at a surveillance vehicle."

Mr. Ramos-Soto argues that the described surveillance is inadequate, as it was too

infrequent, arbitrary, and dissimilar from that used in support of the TT-1 Wiretap.  Mr. Ramos-

Soto also attacks the officers' fear that they had been detected, arguing that it was not reasonable

to assume that they had been spotted.  As discussed above, to establish necessity, the government

must show that surveillance has "been tried unsuccessfully, reasonably appear[s] to be unsuccessful if tried, or [is] too dangerous to attempt." *Ramirez-Encarnacion*, 291 F.3d at 1222. The Affidavit makes such a showing here, and while Mr. Ramos-Soto might believe that further surveillance *could* have been conducted before the officers sought a wiretap, that does not mean that it *must* have been.

### 2.  Questioning and interrogating witnesses or suspects

The TT-2 Affidavit states that since the TT-1 Affidavit, "agents have been unable to identify anyone they might approach to interview at this time without greatly risking exposure of the broader narcotics investigation" but that they will "look to use this investigative technique whenever possible when we feel comfortable that such interviews will not threaten exposing the investigation." (*See* ECF No. 133-2 at 35–37). In the TT-1 Affidavit, which is incorporated to the TT-2 Affidavit, the idea of interviewing suspects was "considered and rejected . . . both because of the unlikelihood that they would voluntarily and truthfully provide information regarding their Target Offenses, and because approaching them would alert the Target Subjects to our interest in their activities, thereby potentially exposing the broader investigation." (ECF No. 133-1 at 39). Thus, it is clear that no questioning of witnesses was conducted before the government applied for the TT-2 Wiretap.

Mr. Ramos-Soto attacks the government's reason for not conducting interviews as impermissible boilerplate language and argues that they are not supported by "specific facts relative to this particular investigation." (ECF No. 154 at 35–36). The court disagrees. The TT-2 Affidavit represents that agents have been unable to identify a potential witness in this investigation. That representation is tailored to this investigation and sufficiently establishes

why officers did not apply this investigative procedure before seeking the TT-2 Wiretap.  *See*

*Foy*, 641 F.3d at 464.

### 3.  Search warrants

Regarding search warrants, the TT-2 Affidavit represents that since the TT-1 Affidavit,

officers have learned where two suspects are storing narcotics and "are planning to obtain a

search warrant for the residence to be served at a future date," as they believe that "conducting a

search warrant at this time would likely expose the broader investigation, while likely also

yielding little information that would be sufficient for agents to achieve all of [their] objectives."

(ECF No. 133-2 at 39–40).  The TT-2 Affidavit further states that officers have not yet identified

where Ramos-Soto is storing narcotics.  (*Id.*).

Mr. Ramos-Soto argues that officers should have used search warrants here and that they

also should have searched another home where they knew drugs deals were regularly

consummated.  (ECF No. 154 at 36–37).  But it is clear that officers need not "'exhaust all other

conceivable investigative procedures before resorting to wiretapping.'"  *Foy*, 641 F.3d at 464

(citations omitted).  Rather, an investigative procedures may be rejected so long as officers

sufficiently explain the basis for the rejection.  The TT-2 Affidavit provides such an explanation

here—officers believed that prematurely executing a search warrant could jeopardize the larger

investigation.  Given that "uncovering the size and scope of [a] conspiracy" is an important goal,

the court finds that the officers' basis for rejecting the use of search warrants was sufficient here.

*See id.* at 464–65 (citations omitted).

### 4.  Infiltration of criminal groups by confidential informants and undercover agents

The TT-2 Affidavit represents that officers remain in contact with the confidential

sources discussed in the TT-1 Affidavit but that they "do not know [Mr. Ramos-Soto] and cannot

provide any information relative to [him]." (ECF No. 133-2 at 38). It further states that a third confidential source has reported knowing Mr. Ramos-Soto but had limited information as to his drug trafficking activity and was therefore, like the first two confidential sources, not "in a position to obtain the type of information that would allow [officers] to achieve the goals of this investigation." (*Id.*).

The TT-2 Affidavit also discusses the use of undercover agents, noting that officers believe that methamphetamine purchased by an undercover agent had been provided to the seller by Mr. Ramos-Soto. (*Id.* at 38–39). It further states that although the use of undercover agents has provided valuable evidence, officers believe that their effectiveness would be limited here, as the undercover agent has not been introduced to Mr. Ramos-Soto and because it is "highly unlikely" that Gordo would introduce the agent to his source(s) of supply. (*Id.*).

Mr. Ramos-Soto both argues that this is impermissible boilerplate language and disagrees with Agent Sannar's conclusion. Neither of Mr. Ramos-Soto's attacks is sufficient. The TT-2 Affidavit shows that officers considered using confidential sources and undercover agents before they sought the TT-2 Wiretap but reasonably concluded that their use would be "unsuccessful if tried." *Ramirez-Encarnacion*, 291 F.3d at 1222. As discussed above, there is no requirement that an application for a wiretap made in the investigation of a conspiracy be tailored to only include information about the ultimate owner of the phone to be tapped. *See Foy*, 641 F.3d at 464–65. The TT-2 Affidavit is therefore adequate on this point.

### 5. Pen registers and trap and trace devices

Mr. Ramos-Soto argues that "[n]o pen registers or trap and trace devices were used in this investigation, and the Government has not explained why." (ECF No. 154 at 28–29). In response, the government asserts that Mr. Ramos-Soto is mistaken, noting that the TT-1 Order

8

ordered Sprint to use a "pen register and trap and trace device" on the telephone number targeted

thereunder (*see* ECF No. 133-1 at 55–56) and that the TT-2 Affidavit properly "contain[s]

statements that show call records were sought, obtained, and analyzed" and "has a Toll Analysis

section, where [Agent] Sannar explained that his review of call records for the target telephones

further buttressed his belief that the target telephones were being used to facilitate the target drug

offenses." (ECF No. 159 at 22–24). The government opines that Mr. Ramos-Soto "most likely

did not realize that subpoenaed toll records are the same records created by the combined use of

a pen register and a trap-and-trace device" or that "the order for TT-1 also ordered the service

provider to install a pen register and trap and trace device for the agents." (ECF No. 159 at 24).

The court's review of the TT-1 Documents and TT-2 Documents, together with the

government's representations at oral argument, confirms that a pen register and trap-and-trace

device were indeed used by officers in this investigation.

      A "pen register" is a "device or process which records or decodes dialing, routing,

addressing, or signaling information transmitted by an instrument or facility from which a wire

or electronic communication is transmitted." 18 U.S.C. § 3127(3). A 'trap and trace device" is

"a device or process which captures the incoming electronic or other impulses which identify the

originating number or other dialing, routing, addressing, and signaling information reasonably

likely to identify the source of a wire or electronic communication." 18 U.S.C. § 3127(4).

Neither a pen register nor a trap and trace devise collects the "contents of any communication."

*See* 18 U.S.C. §§ 3127(3–4).

      The TT-2 Affidavit shows, in the "Toll Analysis" section, that officers monitored calls

and text messages to and from TT-2. (ECF No. 133-2 at 32–33). From this monitoring, officers

were able to verify, for example, that between September 15, 2017, and October 31, 2017, 94

calls and 32 text messages were exchanged between TT-2 and a number used by another target of the investigation.  (*Id*.).  This is the precise sort of information that pen registers or trap and trace devices are used to obtain.  Thus, although the TT-2 Affidavit does not have an enumerated section specifically detailing the officers' use of pen registers or trap and trace devices, it is clear to the court that such tools were indeed utilized here.

Moreover, the TT-2 Affidavit shows that officers overheard calls, pursuant to a separate wiretap, that involved TT-2 and verified that TT-2 was being used in relation to drug transactions.  (*See id*.).

In sum, Mr. Ramos-Soto has failed to meet his high burden of overturning the presumption that the TT-2 Wiretap was proper.  *See United States v. McDowell*, 520 F. App'x 755, 759 (10th Cir. 2013).  Rather, the TT-2 Affidavit established that officers either tried or considered and reasonably rejected each "traditional investigative techniques."  *See Ramirez-Encarnacion*, 291 F.3d at 1222.  As such, and applying a "common sense" reading to the necessity requirements, the court finds that "traditional investigative techniques would [*not*] suffice to expose the crime" here and therefore concludes that the TT-2 Wiretap was necessary. *See Foy*, 641 F.3d at 464; *Kahn*, 415 U.S. at 153.  Mr. Ramos-Soto's motion to suppress is **DENIED**.

### II.  The TT-4 Documents contained a sufficient showing that the TT-4 Wiretap was necessary.

Like Mr. Ramos-Soto, Mr. Zuniga-Rodriguez argues that the government failed to establish that the TT-4 Wiretap was necessary.  The crux of Mr. Zuniga-Rodriguez's arguments is that the government failed to exhaust normal investigative procedures before it sought the TT-4 Wiretap.  But it is not required to.  As stated above, the Tenth Circuit has expressly stated that agents are not required to "'exhaust all other conceivable investigative procedures before

resorting to wiretapping.'" *Foy*, 641 F.3d at 464 (citations omitted). Rather, so long as they "explain the need for wiretaps with some degree of specificity," and their "'statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap,'" they have satisfied their burden of proving necessity. *Id*. That burden "is not great." *Verdin-Garcia*, 516 F.3d at 890. Each of the investigative techniques that the government is required to either utilize or consider will be discussed in turn.

### 1. Standard Surveillance

The TT-4 Affidavit explains that agents had learned, through an intercepted call between two Target Subjects that that one of the Target Subjects had "seen law enforcement vehicles conducting surveillance on him." (ECF No. 133-4 at 38–40). As a result of this development, "agents decreased the amount of physical surveillance used in order to avoid compromising the investigation." (*Id*.). Notwithstanding the reduction, the Affidavit provides three examples of surveillance that was still utilized, including "electronic video surveillance set up at a residence visited by [multiple Target Subjects including Mr. Zuniga-Rodriguez]." (*Id*.). The TT-4 Affidavit further stated that while such surveillance moved agents closer to meeting their objectives, it alone would not be enough to achieve those objectives, because while it "may allow [them] to identify that subjects are at a certain location, [they] are generally unable to determine whether such a visit is criminal in nature." (*Id*.).

These statements show that the agents considered standard surveillance techniques but ultimately decided that the technique "reasonably appear[ed] to be unsuccessful if tried" and was "too dangerous to attempt." *Ramirez-Encarnacion*, 291 F.3d at 1222. This is sufficient. As discussed above, it they are not required to exhaust their use of the technique. *See Foy*, 641 F.3d at 464.

### 2.   Questioning and interrogating witnesses or suspects

Mr. Zuniga-Rodriguez argues that agents did not exhaust the use of witness interviews and failed to demonstrate that they were unlikely to succeed or too dangerous to try.  The TT-4 Affidavit shows that agents interviewed the owner of an apartment complex used by one of the Target Subjects as well as confidential sources.  (*See* ECF No. 133-4 at 40–42).  The TT-4 Affidavit then represented that agents "have not been able to identify anyone else they might approach to interview at this time without greatly risking exposure of the broader narcotics investigation."  (*Id*. at 41–42).  This shows that agents considered the use of this technique but then consciously decided not to apply it, as it would be too dangerous to the investigation.  This representation is sufficient to clear the government's low burden here.  *See Verdin-Garcia*, 516 F.3d at 890.

### 3.   Search warrants

The TT-4 Affidavit offered that "[a]gents have rejected the idea of serving a search warrant at this stage in the investigation" as they "have yet to identify all of the locations where narcotics and narcotics proceeds are being stored" and believed "that conducting a search warrant at this time would likely expose the broader investigation, while likely also yielding little information that would be sufficient for agents to achieve all of objectives [of the investigation]."  (ECF No. 133-4 at 42).

Mr. Zuniga-Rodriguez disagrees with this conclusion and points to the fact less than a month after agents applied for the TT-4 Wiretap, they executed a search on an apartment used by one of the Target Subjects to argue that "a search and seizure of information known at the time likely could have been successful and would have yielded the same results without the need of [the] TT-4 wiretap."  (ECF No. 248 at 10).  The court is not in the position to know what

information agents gathered between the dates they sought the TT-4 Wiretap and executed that search or to second-guess the officers' determination of when the benefits of executing the search outweighed the risk of compromising the investigating.  Rather, it is tasked with analyzing the TT-4 Documents to determine whether they sufficiently stated, as of the date of the Documents, that search warrants "have been tried unsuccessfully, reasonably appear to be unsuccessful if tried, or are too dangerous to attempt."  *Ramirez-Encarnacion*, 291 F.3d at 1222.  They did.

### 4.   Infiltration of criminal groups by confidential informants and undercover agents

Mr. Zuniga-Rodriguez argues that the TT-4 Affidavit "makes no mention of confidential sources used as it relates to [him]" and fails to show that undercover operations were exhausted.  (ECF No. 248 at 9).  While the TT-4 Affidavit indeed does not reference Mr. Zuniga-Rodriguez, it does incorporate the discussions on confidential sources that was contained in prior affidavits in which agents explained that confidential sources' knowledge was limited.  (ECF No. 133-4 at 40).  It further concludes that none of the confidential sources would likely be able to accomplish the goals of the investigation.  Such rationale is sufficient to show that agents applied this technique.  As discussed above, when an investigation is into a conspiracy, there is no requirement that information in a request for wiretap be specifically tailored to the individual who is ultimately discovered to be the owner of the tapped telephone.  *See Foy*, 641 F.3d at 464–65 (citations omitted).

The TT-4 Affidavit acknowledges that while an undercover operative had completed an "undercover purchase of methamphetamine and heroin from [Mr. Zuniga-Rodriguez]" and "has provided valuable evidence," his use was "limited," as it is "highly unlikely that . . . [Mr. Zuniga-Rodriguez] would introduce [him] to [his] source(s) of supply."  (*Id*. at 41).  Mr. Zuniga-

Rodriguez argues that because agents showed that because the use of undercover operations were successful, agents should have continued to pursue them before they sought a wiretap. But, as discussed above, agents are not required to *exhaust* a technique; here, agents sufficiently tried the technique and adequately explained why it failed. This is sufficient. *See Foy*, 641 F.3d at 464; *Ramirez-Encarnacion*, 291 F.3d at 1222.

### 5. Pen registers and trap and trace devices

Mr. Zuniga-Rodriguez acknowledges that the government "relied on toll data analysis for TT-4 to establish probable cause in the [TT-4 A]ffidavit." (ECF No. 248 at 13). But he contests that "no mention of the use of toll data was made in the necessity argument of the affidavit, nor was any specific reasoning given to suggest that the use of toll data was exhausted, reasonably appeared unlikely to succeed if tried, or to be too dangerous." (*Id*.).

While agents are required to address the use of pen registers and trap and trace devices, there is no requirement as to how they present information as to those techniques. *See Barajas*, 710 F.3d at 1107. Rather, a court tasked with reviewing whether agents had sufficiently established that a wiretap was necessary is required to look at materials "'in a common sense fashion'" and must "consider 'all the facts and circumstances.'" *See Foy*, 641 F.3d at 464 (citations omitted). The fact that toll data was not specifically mentioned in a separate section of the TT-4 Affidavit instead of "in the necessity argument" is immaterial.

The TT-4 Affidavit recognized that although the use of toll data had led to "progress in the investigation," it did not allow agents to accomplish all of their investigative goals. (ECF No. 133-4 at 29–30). It specifically recognized that toll data had not allowed agents to fully identify all of the Target Subjects, all of the locations that they used "to store narcotics," or "all the methods used to transport narcotics and transport proceeds gained from the distribution of

narcotics" and that the TT-4 Wiretap was needed to accomplish the investigative goals.  (*Id*. at 30–31).  These statements sufficiently show that toll data had been used but "reasonably appear[ed] to be unsuccessful" in accomplishing the goals of the investigation.  *Ramirez-Encarnacion*, 291 F.3d at 1222.  While Mr. Zuniga-Rodriguez is correct that the TT-4 Affidavit does not show that agents exhausted the use of toll data, such exhaustion is not necessary.  *See Foy*, 641 F.3d at 464.

### 6.  Other Investigative Techniques

Mr. Zuniga-Rodriguez also complains that the government States failed to utilize and/or exhaust additional investigative techniques, such as financial investigations, mobile tracking devices, consensually recorded conversations, and trash covers.  But the government was not required to utilize any of these techniques, and its failure to do so cannot, therefore, be used as grounds to find that TT-4 was not necessary.  *See Barajas*, 710 F.3d at 1107.

In sum, Mr. Zuniga-Rodriguez has failed to meet his high burden of overturning the presumption that the TT-4 Wiretap was proper.  *See McDowell*, 520 F. App'x at 759.  Rather, the TT-4 Affidavit established that officers either tried or considered and reasonably rejected each "traditional investigative techniques."  *See Ramirez-Encarnacion*, 291 F.3d at 1222.  As such, and applying a "common sense" reading to the necessity requirements, the court finds that "traditional investigative techniques would [*not*] suffice to expose the crime" here and therefore concludes that the TT-4 Wiretap was necessary.  *See Foy*, 641 F.3d at 464; *Kahn*, 415 U.S. at 153.  Mr. Zuniga-Rodriguez's motion to suppress is **DENIED**.

### CONCLUSION

For the reasons discussed herein, the court finds that the government met its low burden of establishing in its applications for the TT-2 and TT-4 Wiretaps that the requested wiretaps

were necessary and that Mr. Ramos-Soto and Mr. Zuniga-Rodriquez have failed to meet their

high burden of overturning the presumption that the TT-2 Wiretap and TT-4 Wiretap were

properly authorized.  As such, the Motion to Suppress (ECF No. 94) filed by Mr. Zuniga-

Rodriguez and joined by Mr. Ramos-Soto is **DENIED**.


DATED this 1st day of April, 2021.


BY THE COURT:


_____

Clark Waddoups
United States District Judge